IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 23, 2021 Session

## STATE OF TENNESSEE v. ZACKARI TENNANT

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-157    Angelita Blackshear Dalton, Judge**

_____

**No. M2019-02125-CCA-R3-CD**

_____

The Appellant, Zackari Tennant, was convicted by a Davidson County Criminal Court Jury of especially aggravated robbery, a Class A felony; carjacking, a Class B felony; and employing a firearm during the commission of a dangerous felony, a Class C felony, and was sentenced by the trial court to an effective term of twenty-three years at 100% in the Department of Correction. The Appellant raises essentially three issues on appeal: (1) whether the trial court erred by precluding him from introducing evidence that he was only sixteen years old at the time of the offenses; (2) whether the evidence was sufficient to sustain his convictions; and (3) whether the trial court imposed an excessive sentence by not giving adequate weight to his youth as a factor in mitigation. Based on our review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Michael L. Freeman (at sentencing and on appeal) and David Collins (at trial), Nashville, Tennessee, for the Appellant, Zackari Tennant.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Addie Askew and Matthew Thomas, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I. FACTUAL BACKGROUND**

On the afternoon of November 20, 2015, the victim was accosted outside her Nashville apartment by two teenaged gunmen who demanded her car keys. When she refused to give them her keys, one of the gunmen fired a shot at the ground near her feet, which caused her to throw her keys up into the air. As she was fleeing through the parking lot, the victim looked back to see both gunmen firing at her. The gunmen fired a total of eight shots, with two of the bullets entering the victim's back, causing severe injuries, and one bullet passing through the victim's right thigh. After the victim fell to the ground, the gunmen got into the victim's vehicle and attempted to run over her before driving away.

The Appellant was identified as a suspect after police investigators traced a January 1, 2016 store receipt found in the victim's abandoned Nissan Sentra to the Appellant, and the victim positively identified the Appellant as one of the two gunmen. Following his transfer from juvenile court to criminal court, the Appellant was indicted for attempted first degree murder, especially aggravated robbery, carjacking, and two counts of employing a firearm during the commission of a dangerous felony. On November 5-7, 2018, the Appellant was tried before a criminal court jury, which found him guilty of especially aggravated robbery, carjacking, and one of the two counts of employing a firearm during the commission of a dangerous felony (carjacking). A mistrial was declared on the other two counts of the indictment for which the jury was unable to reach unanimous verdicts.

At trial, the victim testified that on November 20, 2015, she left her work at YMCA aftercare at approximately 6:00 p.m. and went straight to her Nashville apartment to take her dog out before going to an evening babysitting job. As she was about to turn into her apartment complex's driveway, she noticed three teenagers or young adults standing on the corner. She waited momentarily because she thought they were about to walk across the complex's driveway. When they remained standing on the corner, she turned into the driveway, parked, and sat for a minute or two answering texts and emails before getting out of the vehicle. Because she planned to leave for the babysitting job immediately after taking her dog out, she left her purse and cell phone inside her vehicle, taking only her keys with her.

The victim testified that she was starting up a short flight of stairs to the breezeway when two of the young men she had seen on the corner came up to her with guns drawn and directed her to hand over her keys. When she tried to plead with them, the one in front cocked his gun and fired a shot into the ground, which prompted her to throw her keys into the air and begin running toward the parking lot. As she fled, she turned her head and saw that both gunmen had their weapons pointed at her. She heard at least four gunshots but did not at first realize she had been shot. After a moment, however, she felt an increasing pressure that forced her to lie down. As she lay on the ground, the gunmen ran up to her. The victim explained that her car keys had separated from her other keys when she threw her key ring into the air, and, although she was not certain, she believed the gunmen ran up to retrieve the car keys from the ground near her.

The victim testified that she remained lying on the ground until the gunmen got into her vehicle and drove straight toward her. At that point, she was forced to jump up to avoid being run over. In the process, she lost her eyeglasses, which were crushed under her vehicle as the gunmen drove off. The victim stated that the Appellant was the one who grabbed her car keys and that she believed he was the one who was driving her vehicle. She recalled seeing the gunmen stopped in her vehicle at the top of the drive talking to the occupant or occupants of a black car that had pulled up beside them.

The victim testified that she described the first gunman to police as a young African American man with "a little bit of an Afro" who was approximately her height, "chunky but not big," and with a gap in his teeth. She described the second gunman as approximately the same height, skinny, with a sunken-in face and bulging eyes. The victim made a positive courtroom identification of the Appellant as the second gunman and said that both men pointed their guns directly at her. Both also instructed her to hand over her car keys, with the Appellant repeating the demand when she refused the first gunman's order. She said she was frightened for her life during the ordeal.

The victim described her pain level immediately after being shot as a ten. She said she was taken to Vanderbilt Hospital, where she underwent approximately eight hours of emergency surgery, followed by additional surgeries at later dates. She stated that two of the bullets struck her in the back and a third passed through her right thigh. Her uterus was "pulverized," she had to have a temporary colostomy for six months and use a wound vacuum for several months, and she was left with a permanent hernia. One of the bullets remained lodged in her pelvis, and a second bullet remained "floating around in [her] abdomen." In addition, she had extensive scarring from her surgeries, continued to experience dull pain in her back, and, most significantly, would be unlikely to ever bear children, as one of her surgeons had strongly advised against her becoming pregnant due to the damage sustained to her uterus.

The victim identified the photograph lineup she had been shown by the police, from which she had positively identified the Appellant as the second gunman. She said she had immediately recognized the Appellant by his eyes and had been one hundred percent certain in her identification. She agreed that she had also positively and unequivocally identified him in earlier court hearings in the case. She testified that both men wore hoodies, but neither man wore a face mask. She did not think the complex's lights had come on yet, but she was confident she could clearly see the Appellant's face. Both men were within five or six feet of her and "right in [her] face."

On cross-examination, the victim repeated that the three men she saw were either teenagers or "younger people." Although not certain, she believed the third man was in the black car stopped at the top of the drive when the gunmen were exiting in her vehicle.

She testified that both gunmen had their weapons drawn when they confronted her and that she saw both shooting at her as she fled. She disagreed that the first gunman was the leader, testifying that both gunmen appeared "in charge." She acknowledged she had been unable to identify with one hundred percent certainty the first gunman, but she again expressed her absolute certainty in her identification of the Appellant, testifying that she saw his face "very clearly" and that "[h]e has a very recognizable face." She denied she had used marijuana that day but admitted that she had used marijuana in the past.

On redirect examination, the victim, yet again, expressed her absolute certainty in her identification of the Appellant. She testified that she took her identifications of the perpetrators very seriously. For that reason, she had been able to express only seventy-five percent certainty in her identification of the first gunman, but she was one hundred percent certain in her identification of the Appellant as the second gunman.

Eighteen-year-old Kennedy Walls, a friend of the Appellant's, identified the victim's vehicle as one that she and the Appellant had used in late 2015 and early 2016, including on a January 1, 2016, trip to Walmart to purchase a movie. She testified that she was also with the Appellant and another individual in a different vehicle in La Vergne on January 17, 2016.

Officer Douglas Belcher of the Metropolitan Nashville Police Department's Crime Scene Unit identified photographs of evidence collected from the crime scene, including eight nine-millimeter shell casings. On cross-examination, he agreed that he was informed the victim had identified the suspects as a black male and a Middle Eastern male, one of whom had a gun. On redirect examination, he acknowledged that he never spoke to the victim.

Jonathan Webb, a paramedic with the Nashville Fire Department, testified that he arrived on the scene at 6:48 p.m. and transported the victim to Vanderbilt Hospital where, according to his records, she was admitted at 7:06 p.m.

Officer Roderic Williams of the Metropolitan Nashville Police Department testified that he was dispatched on January 9, 2016, to a report of an abandoned vehicle impeding traffic. When he arrived, he found the victim's vehicle in the roadway with a flat tire and various articles strewn around outside it. After gathering the scattered items and placing them in the vehicle's trunk, he had the vehicle towed to impound to be processed.

Officer Jared Jenkins of the Metropolitan Nashville Police Department described his role in securing the crime scene on November 20, 2015.

Detective John Vandenberg of the Metropolitan Nashville Police Department, who conducted the preliminary investigation of the case, testified that the victim, who was in a

great deal of pain, was initially able to tell him that she had been shot and to provide a very basic description of the suspects. According to his notes, the victim reported in the initial interview that she had been approached by two male suspects, "a male black" and a "Middle Eastern or Hispanic[,]" who demanded her car keys and grabbed her keys from her hand when she failed to comply. The victim reported that one or both of the men fired approximately seven shots at her as she fled.

When Detective Vandenberg was able to speak further with the victim at the hospital, she provided more detail, describing one of the suspects as a Middle Eastern or Hispanic male in his late teens or early twenties, approximately 5'7" with a skinny build, who was armed with a handgun and wearing a hooded sweatshirt that was possibly gray. She described the second suspect as a male black in his late teens to early twenties, approximately 5'7" with a medium build, dark complexion, a gap in his front teeth and a short afro, who was armed with a black semi-automatic pistol and wearing a navy blue hooded sweatshirt.

Officer John Hughes of the La Vergne Police Department testified that on January 17, 2016, he came into contact with a vehicle driven by Kennedy Walls. The Appellant was the front seat passenger, and Tremaine Fowler was a backseat passenger. Two nine-millimeter weapons were found in the front area of the vehicle. On cross-examination, he testified that one of the weapons was found underneath the driver's seat, and the other weapon was found in the center console.

Investigator Courtney Bouchie of the Metropolitan Nashville Police Department was one of the crime scene investigators who processed the victim's vehicle. Investigator Bouchie testified that she collected a total of thirteen latent fingerprints from the vehicle and the items found inside it, including a latent print from a cologne bottle that was found in the driver's door pocket. On cross-examination, she acknowledged she had no way to determine when the print was left on the bottle.

Investigator George Bouton of the Metropolitan Nashville Police Department, another crime scene investigator, identified photographs of the victim's vehicle and its contents, which included a Walmart store receipt that he collected into evidence with other items. He acknowledged he did not have a photograph of the cologne bottle and that it was not among the items he collected as evidence.

Detective Joseph Shade Haislip of the Metropolitan Nashville Police Department, who was assigned as lead investigator on November 23, 2015, testified that, according to Detective Vandenberg's email summary of the initial investigation, the victim described the first suspect as a male black, late teens or early twenties, average height and skinny. He said the victim apparently had difficulty determining the ethnicity of the second suspect, describing him as a male white, a male Hispanic, or a male Middle Eastern who was in his

late teens or early twenties and average height and weight. The victim reported that both suspects were armed. The apartment complex's security camera was not operational, and Detective Haislip was unable to find any surveillance tape of the shooting.

Detective Haislip testified that the victim's abandoned vehicle was found on January 9, 2016, towed to an impound lot, and processed on January 12, 2016. Among the items found inside was a Walmart store receipt dated January 1, 2016. He said he went to the Walmart and retrieved a video of the transaction, which showed a young woman and a young man who matched the description of one of the shooting suspects. On January 26, 2016, he received an email identifying the Appellant as a potential suspect in the shooting. The next day, he learned that one of the fingerprints collected from the victim's vehicle belonged to Ms. Kennedy Walls, a Facebook friend of the Appellant, who appeared to be the young woman in the Walmart surveillance video. Based on that information, he prepared a photograph lineup with the Appellant's photograph, which he showed to the victim at her home on February 1, 2016.

Detective Haislip testified that when the victim saw the Appellant's photograph, she became emotional, raising her hand to her mouth, gasping, and immediately pointing to his photograph as she said, "[T]hat's him." The victim expressed absolute certainty in her identification, writing in the comments section above her signature that she was "100 percent sure that is him. He was the one standing behind the black male, he had a gun too."

Having received information that Tremaine Fowler might be the black suspect, Detective Haislip prepared a second photograph lineup with Mr. Fowler's photograph, which he showed to the victim. The victim was unable to make any identification from that lineup. At some point during his investigation, Detective Haislip showed the victim a different photograph lineup from which she identified a different individual with seventy-five percent certainty as the male black suspect.

Detective Haislip testified that he met with Ms. Walls on February 2, 2016, and that she identified herself and the Appellant in the Walmart surveillance video. That same day, he obtained warrants for the Appellant's arrest. At some later point, he became aware of the January 17, 2016 incident in La Vergne in which two nine-millimeter weapons were recovered from a vehicle in which the Appellant, Mr. Fowler, and Ms. Walls had been traveling. On April 13, 2016, Detective Haislip retrieved the two weapons, a black Glock and a Springfield XD9 handgun, and transported them to the Metropolitan Nashville Police Department for comparison with the nine-millimeter shell casings recovered from the scene of the victim's shooting.

On cross-examination, Detective Haislip acknowledged that he used a computer program to select the photographs used in the Appellant's photograph lineup. He said he entered "white" for race because, although the Appellant had a "slightly darker skin tone,"

he was a "male white." He did not know why the cologne bottle found in the victim's vehicle was not collected into evidence, other than that its significance was not realized until the latent print on it was identified as the Appellant's. He conceded the first time the victim mentioned that one of the suspects fired a shot into the ground was during a court hearing in the case. He further conceded the victim at one point indicated that the man in front appeared to be in charge. On redirect examination, he agreed that it was not uncommon for victims of violent crime to recall bits of information about the crime at different dates.

Jessica Davis, a forensic scientist employed at the Metropolitan Nashville Police Department's crime laboratory and an expert in fingerprint identification, testified that she identified the latent print recovered from the cologne bottle as the Appellant's.

Bridget Chambers, a forensic scientist employed at the Metropolitan Nashville Police Department's crime laboratory and an expert in firearms identification, testified that the eight cartridge casings recovered in the victim's shooting had all been fired from the Glock handgun.

The victim, recalled as a witness for the State, testified that when her non-working vehicle was returned to her, she found inside it a cologne bottle that she did not recognize and which had not been there before the vehicle was stolen.

The Appellant elected not to testify and presented no witnesses in his defense. The jury was unable to reach a verdict in count one, which charged the Appellant with attempted first degree murder, and count three, which charged the Appellant with employing a firearm during the commission of the attempted first degree murder, and a mistrial was declared for those counts of the indictment. The jury found the Appellant guilty of especially aggravated robbery, carjacking, and employing a firearm during the commission of the carjacking.

At the December 14, 2018 sentencing hearing, the victim described the dramatic, negative changes in her life since the shooting. Among other things, she had lost her jobs, her apartment, and her dog; had incurred between $300,000 to $400,000 in medical bills; had just been sued in civil court over the stolen vehicle; was unable to walk more than a mile without pain; had regained the approximately 100 pounds she had lost before the shooting; and had changed from a happy, optimistic person to one who was anxious, fearful, and paranoid. She said she had been so depressed and overwhelmed after the shooting that she had experienced a mental breakdown and been hospitalized in a mental hospital for a week after overdosing on her anxiety medication. She had been a nanny for approximately ten years before the shooting, loved children, and missed working with them. Her love of children made the knowledge that she would never be able to bear children especially hard, as she had always expected to have her own one day.

The Appellant's mother, Mindy Tennant, testified that the Appellant's father had left the state without further contact when the Appellant was only eight-years-old, leaving the Appellant to grow up without a father. She said she reared her three sons on her own and was forced to leave them alone without supervision for much of the time while she worked. She stated that the Appellant first began to get into trouble at the age of fourteen when he started hanging out with other children who were bad influences. Before that time, the Appellant had attended school, helped out at home, and was a "good child." When he was fifteen, the Appellant was removed from her custody, and, at the time of the instant offenses, the Appellant was a runaway from State custody. To her knowledge, the Appellant had never been diagnosed with any mental health issues.

After taking the matter under advisement, the trial court entered an extensive written sentencing order on January 11, 2019, in which it sentenced the Appellant as a Range I, standard offender to twenty-three years at 100% for the especially aggravated robbery conviction, ten years at 30% for the carjacking conviction, and six years at 100% for the employing a firearm during the commission of a dangerous felony conviction. The court ordered the ten-year sentence for carjacking to be served concurrently with the twenty-three-year sentence for especially aggravated robbery, and, pursuant to statute, the six-year sentence for employing a firearm during the commission of a dangerous felony served consecutively to the ten-year sentence for carjacking, see Tenn. Code Ann. § 39-17-1324(e)(1), for an effective sentence of twenty-three years at 100% in the Department of Correction.

## II. ANALYSIS

### A. Evidence of Appellant's Age

The Appellant contends that the trial court erred by granting the State's oral motion to preclude evidence that he was only sixteen years old at the time the offenses were committed, which prevented the jury from considering his youth when determining whether he could have formed the requisite mens rea for the crimes. The State asserts that there is no record of such a motion or ruling and argues that the Appellant has waived the issue for failure to provide an adequate record on appeal.

As the State notes, the Appellant has provided no citations to the record to show that the State made any motion, oral or written, to preclude evidence of his age. On appeal, the Appellant asserts that the State's oral motion and the trial court's ruling occurred just before the start of trial. There is, however, no such motion or ruling in the record. The record does reflect that the Appellant sought to substitute new counsel on the first day of trial. New counsel requested a continuance, which the trial court denied, and the trial continued with original counsel after new counsel declined the trial court's offer for him

to remain as elbow counsel.  At the hearing on the motion for new trial, the Appellant was represented by his new counsel, who stated the following:

> [T]he oral motion [for continuance of trial] was overruled.  I stepped aside and the trial moved forward.  Immediately after that after I left the courtroom the State made an oral motion of their own to preclude the defense from offering into evidence, offering any testimony as to the [Appellant's] age.  He was 16/17 years old when the crime was committed.  That is relevant.

New counsel went on to argue that evidence of the Appellant's age was relevant to the issue of whether the Appellant lacked the mens rea for the crimes.  The trial court's and the prosecutor's reactions to that argument support the State's position that it never made any pretrial motion to preclude evidence of the Appellant's age.  The prosecutor expressed confusion about what new counsel was arguing, suggested that it sounded like an argument against the transfer of the Appellant to criminal court, and pointed out that the defense theory at trial had focused on identity rather than whether the Appellant lacked the mens rea for the crimes.  In its order overruling the motion for new trial, the trial court noted, among other things, that the victim had described her assailants as teenagers at multiple points during her testimony, without any objection from the State, and that the primary defense theory at trial was that the Appellant was not one of the offenders.  The court, therefore, concluded that the issue was without merit.

We agree with the State that the Appellant has waived appellate review of this issue by his failure to provide appropriate citation to the record to support his claim that the trial court issued a ruling which precluded him from introducing evidence of the Appellant's age.  Generally, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."  Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7).  If there was, in fact, any such motion to preclude the evidence or any ruling by the trial court, it is not included in the record.  As such, we must presume that any ruling that the trial court may have made with regard to this issue was correct.  See State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

In a brief, conclusionary sentence, the Appellant additionally argues that trial counsel provided ineffective assistance because he "declined to even argue that the option of placing [the Appellant's] age before the jury was appropriate, let alone try to place the fact before them."  Although the Appellant raised the claim of ineffective assistance of counsel in his motion for new trial, he presented no proof and made no argument on the issue at the hearing on the motion, and the trial court did not address the issue in its ruling.  This court has repeatedly warned that raising an effective assistance of counsel claim on

direct appeal is "fraught with peril" since it "is virtually impossible to demonstrate prejudice as required" absent an evidentiary hearing. State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001). As such, we decline to consider this issue. See State v. Michael E. Lones, No. E2005-02777-CCA-R3-CD, 2007 WL 674630, at *5 (Tenn. Crim. App. at Knoxville, Mar. 6, 2007).

## B. Sufficiency of the Evidence

Although he frames his next issue as one involving the weight of the evidence, the Appellant's argument makes it clear that he is challenging the sufficiency of the evidence in support of his convictions. In essence, the Appellant argues that the proof at trial was insufficient for the jury to find him guilty of the crimes beyond a reasonable doubt. Among other things, the Appellant questions the extent of the victim's injuries and the accuracy of her identification of him as one of the gunmen, pointing out that there was "no medical testimony" about the injuries and that she consistently described the second gunman as a Middle Eastern or Hispanic male rather than as a Caucasian male. He also cites the victim's inability to state conclusively that he was the one who shot her. The State argues that the evidence was more than sufficient to sustain the Appellant's convictions. With respect to the victim's inability to state with certainty whether the Appellant shot her, the State notes that the Appellant was charged with the crimes under a theory of criminal responsibility, making it irrelevant whether it was he, rather than the first gunman, who fired the shots from the Glock handgun.

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the

conviction is based upon direct or circumstantial evidence.  See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury.  Tenn. Code Ann. § 39-13-403(a)(1) and (2).  Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  Tenn. Code Ann. § 39-13-401(a).  A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent.  Tenn. Code Ann. § 39-14-103.  Serious bodily injury is defined as a bodily injury that involves:

> (A) A substantial risk of death;
>
> (B) Protracted unconsciousness;
>
> (C) Extreme physical pain;
>
> (D) Protracted or obvious disfigurement;
>
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or
>
> (F) A broken bone of a child who is eight (8) years of age or less.

Tenn. Code Ann. § 39-11-106(a)(34).  Carjacking is defined as "the intentional or knowing taking of a motor vehicle from the possession of another by use of . . . [a] deadly weapon . . . [or] . . . [f]orce or intimidation."  Tenn. Code Ann. § 39-13-404(a)(1), (2).  Finally, as charged in the indictment, it is an offense to possess a firearm with the intent to go armed during the commission of a dangerous felony or employ a firearm during the commission of a dangerous felony.  Tenn. Code Ann. § 39-17-1324(a), (b)(1).  The "dangerous felony" in the instant case was carjacking.

Viewed in the light most favorable to the State, the evidence establishes that the Appellant was armed with a handgun as he and an armed accomplice accosted the victim outside her apartment building and demanded that she hand over her keys.  When the victim initially refused, the Appellant's accomplice fired a gunshot at the victim's feet, causing her to toss her keys into the air and flee through the parking lot.  The Appellant and his accomplice fired their guns at the victim as she fled, with three of the bullets striking her and causing her extreme pain and serious injuries.  Afterwards, the men ran to the victim,

retrieved her car keys, got into her vehicle, and attempted to run over her as they drove away.

The Appellant focuses on the fact that the victim initially described the second gunman as either Middle Eastern or Hispanic to argue that her identification of him was not credible. "The identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). However, "[t]he credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). Moreover, "[i]t is well-established that the identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all competent proof." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

The victim was adamant throughout her testimony that she immediately recognized the Appellant by his distinctive face and that she was one hundred percent certain in her identification. She testified that the gunmen did not wear masks, that they were within five or six feet of her, and that the conditions were such that she had a very clear view of their faces. Her testimony that she immediately recognized the Appellant from the photograph lineup was corroborated by Detective Haislip, who described the victim's emotional and immediate response upon seeing the Appellant's photograph.

In addition to the victim's unequivocal identification of the Appellant as one of the two gunmen, the State introduced the Walmart surveillance videotape, which showed that the Appellant and Ms. Walls were the individuals who engaged in the January 1, 2016 transaction that generated the store receipt found in the victim's abandoned vehicle. The Appellant's fingerprint was found on the cologne bottle left in the victim's vehicle, and Ms. Walls also testified at trial that she and the Appellant used the victim's vehicle in late 2015 and early 2016 after the carjacking. Thus, there was more than sufficient evidence by which the jury could reasonably find that the Appellant was the second gunman involved in the crimes.

The Appellant additionally argues that without medical testimony of the extent of the victim's injuries, there was insufficient evidence that the victim sustained the serious bodily injury required for a conviction for especially aggravated robbery. The Appellant ignores the fact that, in addition to the victim's own detailed testimony about her injuries, the evidence admitted at trial included the victim's extensive medical records from her initial hospitalization and the follow-up care she required.

Finally, the Appellant argues that there was reasonable doubt as to his guilt because the victim was unable to conclusively state that he was the one who shot her and that there was no DNA or fingerprint evidence that directly linked him to the Glock handgun.

However, as the State points out, the jury was instructed on the theory of criminal responsibility, thereby allowing it to find the Appellant guilty by virtue of his participation with his accomplices in the crimes, even if he was not the individual who fired the weapon. See Tenn. Code Ann. § 39-11-402.

We, therefore, conclude that the evidence is sufficient to sustain the Appellant's convictions of especially aggravated robbery, carjacking, and employing a firearm during the commission of a dangerous felony.

### C. Sentencing

The Appellant contends that the trial court imposed an excessive sentence by not giving appropriate weight in mitigation to his status as a juvenile offender at the time of the offenses. The State argues that the trial court's weighing of enhancement and mitigating factors is not an appropriate ground for appeal and that the record shows that the trial court imposed appropriate within-range sentences for the offenses.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

- 13 -

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The court found two enhancement factors present in the case: that the Appellant was adjudicated to have committed delinquent acts as a juvenile that would constitute felonies if committed by an adult, which the court found applicable to all three offenses and that the personal injuries inflicted upon the victim were particularly great, which the court found applicable to the carjacking and employment of a firearm offenses. See Tenn. Code Ann. § 40-35-114(6), (16).

Although the trial court did not specifically address any mitigating factors in its written order, the thoroughness of the order demonstrates that it considered all the relevant sentencing principles and factors of sentencing in imposing within-range sentences for the offenses. The sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. We, therefore, conclude that the trial court did not abuse its discretion in sentencing the Appellant to an effective term of twenty-three years.

## III. CONCLUSION

Based on the entire record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE